IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-02266-RBJ

CITIZENS UNITED, a Virginia Non-Stock Corporation,

     Plaintiff,

v.

SCOTT GESSLER, in his official capacity as Colorado Secretary of State; and
SUZANNE STAIERT, in her official capacity as Colorado Deputy Secretary of State,

     Defendants.

## SECRETARY'S BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION [DOC. 4]

If the Supreme Court has woven a single unifying thread into the past several decades of its campaign finance jurisprudence, it is this: while bans on political speech – in whatever form – are constitutionally suspect, disclosure requirements are typically not. Because this case involves disclosure, and disclosure alone, it is important to recognize this distinction from the outset.

The constitutional parameters of campaign finance law are ever-evolving, and as a consequence the Supreme Court has laid out only a few hard and fast rules since its seminal opinion in *Buckley v. Valeo*, 424 U.S. 1 (1976). Among those are the application of strict scrutiny to outright prohibitions on campaign-related expenditures, accompanied by a less rigorous examination of laws that require only disclosure of spending on those same activities. Because "disclosure requirements impose no ceiling on campaign-related activities," *id.* at 64, they "do not prevent anyone from speaking." *McConnell v. Federal Election Comm'n,* 540 U.S. 93, 201

(2003).  Disclosure requirements are thus subject to exacting scrutiny, which

"requires a 'substantial relation' between the disclosure requirement and a

'sufficiently important' governmental interest."  *Citizens United v. FEC,* 558 U.S.

310 366-67 (2010); *Free Speech v. Fed. Election Comm'n,* 720 F.3d 788, 792-93 (10th

Cir. 2013).[1]

There can be no doubt that most ordinary disclosure requirements satisfy

this test.  Indeed, Plaintiff is certainly aware that the Supreme Court has already

strongly endorsed mandatory disclosure and disclaimer provisions applicable to

"electioneering communications" that are qualitatively identical to the speech at

issue here.  *Citizens United*, 558 U.S. at 371 ("We find no constitutional impediment

to the application of BCRA's disclaimer and disclosure requirements to a movie

broadcast via video-on-demand").  In this lawsuit, Plaintiff has thus shifted its tack

by reframing its challenge to Colorado's disclosure laws as a complaint about the

allegedly unequal coverage of Colorado's press exemption.  Rather than arguing as

it did in *Citizens United* that Colorado's substantial interest in ensuring that its

electorate is informed does not justify compulsory disclosure, Plaintiff instead

asserts that it is unfair for Colorado to compel disclosure from Citizens United while

simultaneously exempting the *Denver Post*, the *New York Times*, and other

---

[1] In *McCutcheon v. Federal Election Comm'n,* 134 S.Ct 1434, 1444 (2014), the
Supreme Court applied "exacting scrutiny" somewhat more stringently in the
context of a limitation on contributions.  In the wake of *McCutcheon,* the federal
circuit courts of appeals have not imported this stricter formulation of "exacting
scrutiny" into the disclosure context.  *See, e.g. Libertarian Party of Ohio v. Husted,*
751 F.3d 403, 413-14 (6th Cir. 2014); *Wisconsin Right to Life v. Barland,* 751 F.3d
804, 840-41 (7th Cir. 2014); *Vermont Right to Life Comm., Inc. v. Sorrell,* 2014 WL
2958565, at *36-37, Case No. 12-2904-cv (2d Cir. July 2, 2014)).

traditional media organizations. Curiously, Plaintiff manages to articulate this argument without ever uttering the phrase "equal protection," either in its complaint or its motion for a preliminary injunction. Terminology aside, the reason for this shift is transparent – having lost its challenge under the *exacting* scrutiny standard applicable to disclosure requirements under the First Amendment in *Citizens United*, Plaintiff has developed a new legal theory designed to secure the application of *strict* scrutiny to Colorado's allegedly differential treatment of political speakers.

This Court should deny the Plaintiff's motion for a preliminary injunction. At the threshold, the United States Supreme Court has repeatedly suggested its approval of the lines drawn between the traditional press and entities like Citizens United. Binding Supreme Court precedent therefore strongly suggests that Plaintiff is unlikely to prevail on the merits of its claim. Nor will compliance with Colorado's disclosure requirements for electioneering communications irreparably injure Citizens United. And finally, the issuance of an injunction – especially one that suspends Colorado's disclosure requirements across the board – would substantially harm the ability of Colorado's electorate to properly evaluate the political messages that, as the general election approaches, have already begun to flood the airwaves and pervade public consciousness.

## I.    Preliminary injunction standards.

When seeking a preliminary injunction, a plaintiff must show that the right to relief is clear and unequivocal. *Schrier v. University of Colorado*, 427 F.3d 1253,

1258 (10th Cir. 2005).  Plaintiff, as movant, must establish that (1) it will suffer irreparable injury unless the injunction issues; (2) the threatened injury outweighs damage the proposed injury may cause the opposing party; (3) the injunction would not be adverse to the public interest; and (4) there is a substantial likelihood of success on the merits.  *Id.*  A request for a preliminary injunction seeking to alter the status quo is disfavored and, as such, is to be more closely scrutinized.  *Id.* at 1259.

It is the movant's burden to establish that each of the first three factors tips in the movant's favor.  *Heideman v. South Salt Lake City*, 348 F.3d at 1182, 1188-89 (10th Cir. 2003).  Where the moving party has established that the first three facts "tip *decidedly* in its favor, the 'probability of success requirement' is somewhat relaxed."  *Heideman v. South Salt Lake City*, 348 F.3d at 1189.  In such cases, the court must employ a "fair ground for litigation standard."  *Id.*  However, the Tenth Circuit has also stated that, in cases in which a party seeks to enjoin governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the court must apply the more rigorous "substantial likelihood of success" requirement regardless of the determination of the first three factors.  *Id.*  Here, Plaintiff seeks to enjoin governmental action taken in the public interest pursuant to Colorado's Constitution and statutory campaign finance code.  Therefore, any award of a preliminary injunction must be based on a finding that Citizens United has a substantial likelihood of success on the merits.

The Tenth Circuit applies a heightened standard to three types of preliminary injunctions: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief it could recover at the conclusion of a full trial on the merits. *Summum v. Pleasant Grove City*, 483 F.3d 1044, 1048 (10th Cir. 2007). A preliminary injunction falling into one of these categories "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id.* 1048-49 (quoting *O Centro Espirita Beneficiente União Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc), *aff'd and remanded, Gonzales v. O Centro Espirita Beneficiente União Do Vegetal*, 546 U.S. 418 (2006). Plaintiff must "make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id.* at 1049 (quoting *O Centro*, 389 F.3d at 976).

The status quo is "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001) (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991)). To assess the status quo, the court must look "'to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights.'" *Schrier* at 1260 (quoting *SCFC ILC, Inc.* 936 F.2d at 1100, n. 8). Here, by requesting that the Court enjoin Colorado's long-standing disclosure laws, Plaintiff seeks to radically alter the status quo. As explained in more detail below, taken to

its logical conclusion, Citizen United's complaint seeks nothing less than an end to campaign finance disclosure in its entirety.

## II.     Factual and legal background.

The parties appear to be in agreement on many of the facts.  For example, there is no dispute that, among other things, Citizens United produces, markets, and distributes films on various topics, including some political figures.  These films are often released shortly before an election in which the political figure is a candidate, and historically have amounted to "a feature-length negative advertisement that urges viewers to vote against" the candidate.  *Citizens United,* 558 U.S. at 325.  There is likewise no dispute that prior to 2010, Citizens United was required to comply with federal disclosure and disclaimer requirements for films and associated advertising that related to federal candidates.  *See* FEC Advisory Opinion No. 2004-30.  In 2010, and notwithstanding the Supreme Court's endorsement of disclosure in *Citizens United,* the Federal Election Commission reversed itself, finding that FECA's press exemption applied to Plaintiff's films.  *See* FEC Advisory Opinion No. 2010-08.

It is unclear from the complaint when Citizens United decided to make a film touching on Colorado politics, but in April 2014 Plaintiff filed a petition for a declaratory order with the Colorado Secretary of State ("the Secretary"), requesting that the Secretary affirm that it was exempt from disclosure under Colorado law. As the state's chief elections officer, the Secretary is empowered to administer and enforce Colorado's campaign finance laws, which appear both in article XXVIII of

the Colorado Constitution ("Amendment 27") and in the Fair Campaign Practices Act ("FCPA").  *See* Colo. Const. art. XXVIII, § 9(1)(b); *see also* C.R.S. § 1-45-111.5. Under Colorado law, however, the Secretary's interpretive latitude is limited where the language of Amendment 27 and the FCPA is clear.  *See, e.g., Colorado Ethics Watch v. Gessler,* 2013 COA 172M (Colo. App. Dec. 12, 2013), *petition for writ of certiorari pending.*

As the Secretary's declaratory order stated, Colorado law on this point is clear.  *See Complaint* Ex. B [Doc. 1-2] at 5-8.  Plaintiff's planned half-hour film, *Rocky Mountain Heist,* is an electioneering communication because it will: 1) unambiguously refer to a candidate for the office of Governor, and 2) be distributed to members of Colorado's electorate within sixty days before the general election. Colo. Const. art. XXVIII, §2(7)(a); C.R.S. § 1-45-103(9).  Whether the film would also amount to an "expenditure" was less clear at the time of the declaratory order,[2] but either way *Rocky Mountain Heist* does not qualify for Colorado's press exemption because it is not print media, will not be produced by a broadcast facility, and does not meet the requirements of the "regular business" exception as that provision has been interpreted by Colorado courts.  *See Complaint* Ex. B [Doc. 1-2] at 5-8, *citing Colorado Citizens for Ethics in Gov't v. Comm. for the American Dream,* 187 P.3d 1207 (Colo. App. 2008) (interpreting Amendment 27's "regular business" exception

---

[2] Because the film was not complete at the time of the declaratory order, the Secretary offered no opinion as to whether it amounted to an "expenditure" under Colorado law.  Plaintiff's complaint sheds no additional light on this question, but its motion for preliminary injunction states that the film and/or its advertising will contain express advocacy.  Doc. 4 at 9.

"as limited to persons whose business is to broadcast, print, publicly display, directly mail, or hand deliver candidate-specific communications within the named candidate's district as a service, rather than to influence elections").

Under the status quo, Citizens United will be required to file reports disclosing its electioneering communications once it has spent more than $1000 on distribution and/or advertising of the film. Colorado's definition of "electioneering communications" does not encompass Citizens United's production budget. Thus, assuming that the film does not contain express advocacy, the $548,975 that Plaintiff alleges is "dedicated to production" would not be subject to disclosure. *Complaint* ¶ 29. Likewise, if the film is only an electioneering communication, Plaintiff would be required to disclose only the identity of its contributors who contributed more than $250 *and* specifically earmark that amount for the film project. *See* 8 Colo. Code of Regulations 1505-6, Campaign Finance Rule 11.1.

If the film amounts to an "expenditure" – *i.e.,* if the production of *Rocky Mountain Heist* involves the money spent "for the purpose of expressly advocating the election or defeat of a candidate," Colo. Const. art. XXVIII, § 5(8)(a)[3] – then Citizens United's disclosure obligations would be more comprehensive. Assuming an absence of candidate coordination, Citizens United would be required to register

---

[3] To qualify as an expenditure under Colorado law, the film must contain actual express advocacy in the form of *Buckley*'s "magic words." *See Colo. Ethics Watch v. Senate Majority Fund,* 269 P.3d 1248, 1250-51 (Colo. 2012), *citing Buckley,* 424 U.S. at 44, n.52. Thus, even if the film is the "functional equivalent of express advocacy," it will not amount to an expenditure unless it "explicitly exhort[s] the viewer or reader to vote for or against a candidate in the upcoming election." *Senate Majority Fund,* 269 P.3d at 1255.

as an independent expenditure committee, periodically report the committee's

activities,[4] and place a disclaimer identifying itself on the film and its advertising.

C.R.S. § 1-45-107.5. Identification of contributors would be required only where a

contributor, "for the purpose of making an independent expenditure, donates more

than two hundred fifty dollars per year to the person expending one thousand

dollars or more on an independent expenditure." C.R.S. § 1-45-107.5(3)(b)(I).

### III.   Standard of review and burden of proof.

#### A. Standards applicable to as-applied and facial challenges.

Citizens United raises both facial and as-applied challenges to Colorado's

disclosure scheme for electioneering communications and independent

expenditures. In an as-applied challenge to a law that might infringe on the

exercise of First Amendment rights, the proponent of the law (i.e., the government)

"bears the burden of establishing its constitutionality." *Colorado Right to Life

Committee v. Coffman,* 498 F.3d 1137, 1146 (10th Cir. 2007) ("*CRLC*").

A facial constitutional challenge, in contrast, seeks to invalidate a statute or

regulation itself, rather than focusing on a particular unconstitutional application of

the statute or regulation. *United States v. Frandsen,* 212 F.3d 1231, 1235 (11th Cir.

2000). Because a facial challenge seeks such broad relief, it requires a plaintiff to

make a correspondingly broad showing of unconstitutionality in order to succeed.

*See Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449 (2008)

---

[4] This would not involve Citizens United opening its books to the public. Here, the independent expenditure committee would simply be required to report the spending associated with the production and distribution of *Rocky Mountain Heist.*

("a plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.,* that the law is unconstitutional in all of its applications"), *quoting United States v. Salerno,* 481 U.S. 739, 745 (1987).  The Tenth Circuit has "left undecided whether a plaintiff making a facial challenge must establish that no set of circumstances exists under which the Act would be valid," instead holding that "it is clear a litigant cannot prevail in a facial challenge to a regulation or statute unless he at least can show that it is invalid in the vast majority of its applications." *See Hernandez-Carrera v. Carlson,* 547 F.3d 1237, 1255-56 (10th Cir. 2008) (internal quotations and citations omitted).

### B.  Plaintiff's claims should be analyzed under, at most, intermediate or exacting scrutiny.

Plaintiff maintains that strict scrutiny should apply because Colorado's press exemption "burden[s] the speech of some speakers, but not others, based on the speakers' identity[.]"  Doc. 4 at 13.  This argument has elements of both equal protection and First Amendment law, but irrespective of the framework employed this Court should decline to apply strict scrutiny.  Even if Colorado's disclosure laws were identity-focused – and they are not – they impose a form of regulation entirely distinct from speech bans.  Except under very limited circumstances not alleged here,[5] disclosure requirements place no limit on the amount or quantity of speech

---

[5] In *Brown v. Socialist Workers Party*, 459 U.S. 87 (1974), for example, the Court held that applying a disclosure law to an unpopular minor political party would unconstitutionally chill political participation due to the risk of threats, harassment, or reprisals from either Government officials or private parties.  *See*

that an individual or organization may disseminate.  For that reason, the Supreme

Court has declined to import the strict scrutiny standard that it applies to

contribution and expenditure limits into the disclosure context, instead applying the

more relaxed "exacting scrutiny" standard in cases involving challenges to

disclosure laws.  This Court should follow the Supreme Court's lead.

### 1. Colorado's disclosure laws neither ban any speech nor discriminate based on the identity of the speaker.

In support of its strict scrutiny argument, Plaintiff relies primarily on

*Citizens United* and *First National Bank of Boston v. Bellotti,* 435 U.S. 765 (1978).

Citizen United's examination of these cases is undermined by its elision of several

key aspects of the Supreme Court's analysis.

*First,* neither *Citizens United* nor *Bellotti* involved a simple "burden" on

corporate political speech.[6]  Rather, both cases struck down an outright ban on

speech, while simultaneously extolling the virtues of compelled disclosure.  *See*

*Bellotti,* 435 U.S. at 792, n.32 ("Identification of the source of advertising may be

required as a means of disclosure, so that the people will be able to evaluate the

arguments to which they are being subjected"); *Citizens United,* 558 U.S. at 370

---

*also Doe v. Reed,* 561 U.S. 186 (2010).  Plaintiff does not allege that it faces these
challenges, instead offering only a conclusory allegation that compliance with
Colorado's disclosure laws "is likely to chill the speech of Citizens United and those
individuals who wish to support Citizen United's speech[.]" Doc. 1 ¶ 44.
[6] *Bellotti* was also decided solely in the context of speech regarding a ballot
measure, rather than a candidate election.  The Tenth Circuit has held that
corruption concerns are attenuated with respect to ballot issues and that public
interest in disclosure is somewhat diminished as a result, particularly where
"contributions and expenditures are slight." *Sampson v. Buescher,* 625 F.3d 1247,
1259 (10th Cir. 2010).

("The First Amendment protects political speech; and disclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way. This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages."). Here, by contrast, no provision of Colorado law prohibits Plaintiff from making its film, distributing it, and spending unlimited amounts of money promoting it. All that Colorado law requires is compliance with the state constitution's modest disclosure requirements for electioneering communications and expenditures. Thus, to the extent that Plaintiff's challenge arises under the First Amendment, this Court should distinguish it from cases involving speech bans, and decline to apply strict scrutiny for that reason.

*Second,* Plaintiff's complaint about identity-based discrimination hinges on its assumption that its identity is the determinative factor as to whether it qualifies for the media exemption. This assumption is incorrect. As explained in more detail *infra*, Colorado's laws are identity-neutral. The *Denver Post*'s newspaper or website would normally be regarded as press, but if that same organization changed its manner of speech, releasing a movie identical to *Rocky Mountain Heist*, the press exemption would likely not apply and Amendment 27 would require disclosure. *See, e.g., Reader's Digest Assn. v. Federal Election Comm'n,* 509 F.Supp. 1210, 1214 (S.D.N.Y. 1981) (rejecting assertion that the press exemption would "exempt any dissemination or distribution using the press entity's personnel or equipment, no matter how unrelated to its press function"). Likewise, if an organization that had

not previously been recognized as a press entity in Colorado began distributing a periodical newsletter in Colorado that interspersed news and commentary, that communication would very likely qualify as press irrespective of the organization's identity or ideology.

*Third,* even assuming *arguendo* that Plaintiff is correct, and that Amendment 27 differentiates between certain speakers based on their identity, Plaintiff's argument ignores not only substantial precedent to the contrary, but also the focus of the *Citizens United* opinion itself.  As such, even if Plaintiff is correct that Colorado's disclosure laws draw distinctions based on the identity of the speaker, binding precedent forecloses the application of strict scrutiny here.

Plaintiff conflates *Citizen United*'s criticisms of the corporate independent expenditure ban, and the Court's grounds for invalidating it, with its 8-1 endorsement of the accompanying disclosure provisions.  Plaintiff's argument rings hollow with respect to both points.  First, as Justice Stevens' *Citizens United* dissent pointed out, identity-based distinctions are a regular feature of both First Amendment law in general, and campaign finance in particular.  558 U.S. at 419-423 (Stevens, J., dissenting).  This trend has continued in the years after *Citizens United* was decided.  Both federal and state law, for example, provide that an organization owned or controlled by a political party cannot claim the press exemption.  2 U.S.C. § 431(9)(B)(i); Colo. Const. art. XXVIII, § 7(b)(I).  And in the wake of *Citizens United,* courts have continued to uphold bans on direct corporate

contributions to candidates. *See, e.g., United States v. Danielczyk,* 683 F.3d 611 (4th Cir. 2012).

> **2. Because the disclosure requirements do not limit the quantity of Plaintiff's speech, they should be analyzed under exacting scrutiny or a "time, place, manner" framework.**

While exacting scrutiny remains the most obvious alternative in challenges of the type presented here, Colorado's disclosure requirements for electioneering communications and independent expenditures can also be analogized to "time, place, and manner" restrictions on speech, because rather than acting as a prior restraint, they simply impose reasonable, content-neutral conditions on the dissemination of electioneering communications and express advocacy.[7]  Because Colorado's exemptions are content and identity neutral, they are not, virtually by definition, an "attempt to give one side of a debatable public question an advantage in expressing its views to the people." *City of Ladue v. Gilleo,* 512 U.S. 43, 51 (1994).  As "a less restrictive alternative to more comprehensive regulations of speech," *Citizens United,* 558 U.S. at 369, the indirect impact of the disclosure laws on a speaker's engagement in the political process does not warrant strict scrutiny.

The standards under exacting scrutiny and for time, place, and manner restrictions are remarkably similar.  Exacting scrutiny "requires a 'substantial

---

[7] The Secretary acknowledges that *Buckley* explicitly rejected a "time, place, and manner," analysis for the across-the-board limitations on contributions and expenditures that were at issue in that case.  *See Nixon v. Shrink Missouri Gov't PAC,* 528 U.S. 377, 386 (2000), *citing Buckley,* 424 U.S. at 15-16.  However, the Court has not extended that portion of its analysis to any type of disclosure requirements, including those that are issue here.

relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Free Speech,* 720 F.3d at 792-93.  Likewise, intermediate scrutiny that is applied to content-neutral time, place and manner restrictions requires a showing of 1) a substantial governmental interest, that 2) is "'narrowly drawn' to serve that interest 'without unnecessarily interfering with First Amendment freedoms." *American Target Advertising, Inc. v. Giani,* 199 F.3d 1241, 1247 (10th Cir. 2000).  Where the regulatory requirements are reasonable and leave open "ample alternative channels of communication," they will satisfy the time, place, and manner standard.  *Wells v. City & County of Denver,* 257 F.3d 1132, 1145 (10th Cir. 2001).  Whichever of these standards the Court applies, Plaintiff is unlikely to prevail on the merits of its challenge.

### IV.   Plaintiff is unlikely to prevail on the merits of its First Amendment claim.

Colorado's disclosure requirements pass constitutional muster under either exacting scrutiny or a "time, place, and manner" approach.  At the threshold, there can be no serious dispute that disclosure of electioneering communications and independent expenditures is closely related to Colorado's substantial interest in ensuring that its electorate is informed.  *See Republican Party v. King,* 741 F.3d 1089, 1095 n.3 (10th Cir. 2013) ("The Court upheld disclosure requirements at issue in *Citizens United* because they provided the electorate with information about the identity of the speaker and did not impose a chill on political speech, even for independent expenditures.").  "[P]rompt disclosure of expenditures can provide shareholders and citizens with the information needed to hold corporations and

elected officials accountable for their positions and supporters." *Citizens United* 558 U.S. at 370.  While the First Amendment protects Citizens United to release its film without governmental interference, "disclosure permits citizens and shareholders to react" to its advocacy "in a proper way." *Id.* at 371.

Amendment 27's press exemption is crafted in a way that sufficiently links the scope of disclosure – and what speech triggers it – with that governmental interest.  Generally speaking, the justifications for requiring disclosure apply more strongly to isolated instances of political advocacy than they do to speech by institutionalized and longstanding press entities.  Newspapers, periodicals, and recurring television broadcasts all require, by definition, long-term, repeat participation.  Voters can track these messages and determine who is responsible for them by, for example, examining the masthead or the editorial page of a newspaper, and observing the publication's advertising practices.  Over time, Colorado's citizens can gauge the trustworthiness of a particular source based on their perception of its ideology and track record.  Interested electors can even respond to reporting or opinions they take issue with, by calling a news station, writing letters to the editor, or even by founding their own competing press entity.

None of these informational advantages accrue to the viewer or reader of drop-in political advocacy like a standalone film, a single election mailer, or an anonymous website that appears for only a few weeks before an election.  A speaker's identity often matters to evaluating the credibility of the speech.  *Bellotti,* 435 U.S. at 792, n.32; *see also Citizens Against Rent Control / Coalition for Fair*

*Housing v. Berkeley*, 454 U.S. 290, 299-300 (1981) ("The integrity of the political system will be adequately protected if contributors are identified in a public filing revealing the amounts contributed; if it is thought wise, legislation can outlaw anonymous contributions.").  Isolated instances of anonymous political advocacy leave voters adrift, without the means of evaluating the message that are associated with the established, institutional reputations of those entities that would qualify for Colorado's press exemption.  While there are certainly exceptions, exacting scrutiny requires only "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *McCutcheon v. Federal Election Comm'n*, 124 S.Ct. 1434, 1456-57 (2014) (internal quotation omitted)

Applying a "time, place and manner" analysis would yield the same result. As already noted, there is a substantial governmental interest in promoting disclosure, and compliance with Colorado's law not only places a minimal burden on Citizen United's proposed activities, but also leaves open multiple disclosure-free avenues of communication should Citizens United choose to take advantage of them.  These reasonable requirements "do not prevent anyone from speaking." *McConnell,* 540 U.S. at 201.  Indeed, *Citizens United* expressly rejected such a claim in any event, "find[ing] no constitutional impediment to the application of BCRA's disclaimer and disclosure requirements to a movie broadcast via video-on-demand." 558 U.S. at 371.  Plaintiff is thus unlikely to prevail on the merits of its First Amendment claim.

**V.   To the extent Plaintiff's argument is grounded in equal protection principles, it is unlikely to succeed on the merits.**

A review of the preliminary injunction motion makes plain Plaintiff's belief that Colorado's application of the press exemption to traditional press entities, but not to Citizens United, amounts to unequal and unfair treatment of the laws. Assuming that Plaintiff does not ground its argument solely in First Amendment principles, the Fourteenth Amendment's Equal Protection Clause becomes equally important. In fact, Plaintiff's advocacy for the application of strict scrutiny suggests that it is, in fact, asserting an equal protection claim—as already discussed, if Plaintiff's claim were a pure First Amendment challenge to Colorado's disclosure requirement, strict scrutiny would be off the table. *See, e.g., Republican Party v. King,* 741 F.3d 1089, 1095 n.3 (10th Cir. 2013) ("Disclosure and disclaimer requirements…are subject to 'exacting scrutiny'"); *Olson v. City of Golden,* 541 Fed. Appx. 824, 830 (10th Cir. 2013) ("In cases such as this one, which involve challenges to the constitutionality of disclosure requirements, the relevant constitutional test is "exacting scrutiny…").

This makes it all the more remarkable that both Plaintiff's complaint and preliminary injunction motion virtually ignore the fundamental prerequisites for asserting an equal protection claim, offering little more than oblique and conclusory assurances that "[t]here is no conceivable basis" for applying the press exemption to some entities, but not to Citizens United's documentary filmmaking. Doc. 4. at 22. Even this brief reference, however, misses the point. *Of course* it is possible for

differently situated speakers to produce virtually identical products.  But in an

equal protection challenge, one does not pull out a slide rule in order to measure the

degree of similarity between two different types of *speech*.  Rather, the relevant

inquiry requires the Court to first examine the *speakers themselves* to determine

whether they are similarly situated.[8]  While Plaintiff spends pages and pages

preemptively disparaging Colorado's justifications for requiring disclosures

associated with *Rocky Mountain Heist*, neither the complaint nor the preliminary

injunction motion ever even attempts to show that Citizens United is similarly

situated to those entities that qualify for the press exemption.  Assuming that

Plaintiff intends to advance an equal protection claim at all, this is a significant

oversight, and one that should prove fatal to Plaintiff's claim.

## A. Plaintiff is not similarly situated to those entities that qualify for the press exemption.

"The Equal Protection Clause does not forbid classifications. It simply keeps

governmental decisionmakers from treating differently persons who are in all

relevant respects alike."  *Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992).  Although

Plaintiff suggests otherwise, there are principled and meaningful distinctions

between Citizens United and those entities covered by Colorado's press exemption.

---

[8] It is possible for a press entity to create content that is not covered by the media
exemption.  *See, e.g., Reader's Digest Assn. v. Federal Election Comm'n,* 509 F.Supp.
1210, 1214 (S.D.N.Y. 1981) (rejecting assertion that the press exemption would
"exempt any dissemination or distribution using the press entity's personnel or
equipment, no matter how unrelated to its press function"); *see also MCFL,* 479 U.S.
at 250-51 (while pro-life group's regular newsletter may have been subject to press
exemption, "Special Edition" was not).  Irrespective of a particular publication's
content or look, however, it is not exempt unless it has been created by an entity
that fits within the criteria established by Colo. Const. art. XXVIII.

The most in-depth analysis of this question appears in *Bailey v. State of Maine Comm'n on Governmental Ethics and Election Practices,* 900 F.Supp.2d 75 (D.Me. 2012). *Bailey* involved a challenge by an anonymous blogger who created a website, called "The Cutler Files," that was devoted to attacking gubernatorial candidate Elliot Cutler. *Id.* at 78-79. The blog was an independent expenditure, but did not comply with applicable disclosure and disclaimer laws. *Id.* at 80. After the state election commission imposed a fine for violation of Maine's campaign finance laws, the blogger sued, arguing in part that the state's refusal to apply the press exemption to his website violated the Fourteenth Amendment's guarantee of equal protection.

The *Bailey* court rejected the blogger's position at the threshold, finding that he was not similarly situated to the type of traditional press entity that was covered by the media exemption. The court freely acknowledged that the advent of the internet has changed the media landscape – by, for example, substantially shortening the news cycle. This was consistent with FEC's acknowledgement that "periodical" should not cover just print publications that are issued on a regular schedule, but also websites and other similar outlets that "are covering and reporting news stories in the same way that traditional media entities have reported on newsworthy events[.]" 71 Fed. Reg. 18589, 18610.

Press status is thus not dependent on the medium of transmission. Instead, consistent with the Supreme Court's guidance in *MCFL,* "courts must look to a combination of factors pertaining to the form of a publication to distinguish

'campaign flyers from regular publications.'" *Bailey*, 900 F.Supp.2d at 90, *quoting*

*MCFL*, 479 U.S. at 251.  Thus, to support its conclusion that "The Cutler Files"

website did not qualify for the media exemption, the *Bailey* court looked to the fact

that the website was only live for two months, that the content was static, and that

"at the time of the publication, Bailey was a paid political consultant for an

opposing candidate." *Bailey,* 900 F.Supp.2d at 90-91.  No one of these factors was

dispositive on its own, but after reviewing the totality of the circumstances the

Court concluded that "the undisputed facts of this case establish that the Cutler

Files was more like a negative campaign flyer than a periodical publication," and

thus "rightfully did not fall within the press exemption for a periodical publication."

*Id.* at 91.

 *Rocky Mountain Heist* does not purport to be a periodical publication, but this

Court should nonetheless adopt the same multi-factor approach as *Bailey* to

determine whether the film's creator qualifies as a press entity.  One sharp

distinction between Plaintiff and most traditional press entities is its corporate form

and mission.  Unlike most traditional media, Citizens United is a 501(c)(4) social

welfare organization with an overtly ideological focus.  It does not hold itself out as

a news organization, instead stating that: "Through a combination of education,

advocacy, and grass roots organization, Citizens United seeks to reassert the

traditional American values of limited government, freedom of enterprise, strong

families, and national sovereignty and security."[9]  Unlike many traditional media

---

[9] http://www.citizensunited.org/who-we-are.aspx, *last visited* September 2, 2014.

organizations, which commonly receive monetary support from advertisers, Citizens United solicits monetary donations from individuals – donations that are shielded from public view – in order to fund its advocacy. And unlike traditional press entities, Citizens United's films are not released on a normal periodic schedule. Traditional press entities report on the news as it happens, rather than publishing their content only in the weeks leading up to the election.

This is not to say that any one of these factors is dispositive. Other nonprofits, for example, receive more funding through member donations than through advertising, but those who regularly report the news would presumptively qualify for the press exemption regardless of their corporate status. The plaintiff in *MCFL,* is a good example of this. That ideological non-profit published a regular newsletter that the Supreme Court suggested would have been entirely exempt from the challenged expenditure ban had it been the source of the editorial material that triggered the FEC's complaint. *MCFL,* 479 U.S. at 250-51. Similarly, traditional press entities – for-profit and non-profit alike – regularly editorialize and take positions on political races, although this type of commentary is typically interspersed with more standard news coverage. When it is not, however, as was the case in *MCFL* and *Readers Digest,* even a traditional press entity's activity will not meet the requirements of the press exemption. *See McConnell,* 540 U.S. at 208 (press exemption "does not afford *carte blanche* to media companies generally to ignore FECA's provisions"); *San Juan County v. No New Gas Tax,* 157 P.3d 831, 841 (Wash. 2007) ("The distinction between 'political advertising' and 'commentary' may

be relevant in deciding whether a media entity is performing a legitimate press function.").

Thus, it cannot be Citizen United's non-profit status, or even its ideological bent, that alone distinguishes it from an entity that is considered press. Rather, it is the totality of the circumstances surrounding its organization and practices. When those circumstances are considered together with the advocacy in and timing of the subject film, the distinctions between Citizens United and the traditional press are undeniable. As the Supreme Court noted when evaluating a similar film in *Citizens United*: "Citizens United argues that Hillary is just 'a documentary film that examines certain historical events.' We disagree. The movie's consistent emphasis is on the relevance of these events to Senator Clinton's candidacy for President," and as a consequence "there is no reasonable interpretation of Hillary other than as an appeal to vote against Senator Clinton." 558 U.S. at 325-26 (internal citation omitted). This Court should apply similar reasoning here. There are genuine differences between entities and activities that are clearly covered by the press exemption and those that are not. Those differences establish that Citizens United is not similarly situated to the traditional press. To the extent Plaintiff raises an equal protection challenge, it fails at the threshold.

### B. Even if Plaintiff is similarly situated to entities that qualify for the press exemption, Colorado has ample justifications for the distinctions that it has drawn.

Assuming *arguendo* that Plaintiff is able to show that it is similarly situated to entities covered by the press exemption, rational basis should apply. Under this

level of review, the provision is presumed valid, and the classification must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313 (1993).

Relying solely on cases that involved outright speech bans, as opposed to disclosure requirements, Plaintiff argues that Colorado must advance a "compelling interest in applying its reporting and disclosure requirements in a discriminatory manner to some speakers…but not to others." Doc. 4. at 14. As the Supreme Court has often stated, however, disclosure requirements "do not prevent anyone from speaking." *Citizens United,* 558 U.S. at 365 (internal quotation omitted). Caselaw on the burdens associated with speech bans is therefore inapposite.

Instead, assuming that there is a need to reach the merits of an equal protection claim at all, this Court should apply a standard of review that is commensurate with the lesser nature of the burden imposed by Colorado's disclosure requirements. In the equal protection context, that standard is rational basis review. As the court noted when considering an equal protection challenge to a law on lobbying disclosures in *Many Cultures One Message v. Clements,* 830 F.Supp.2d 1111, 1192-93 (W.D. 2011), "while the exemptions plaintiffs challenge here may be directed at specific types of speakers, as discussed above they do not regulate speech *per se*, given that they are only exemptions from the reporting and disclosure requirements contained in" Washington law. While political speech is certainly a fundamental right, content-neutral disclosure requirements such as

those at issue here come nowhere near the "speech *restrictions* based on the identity of the speaker" that the *Citizens United* court suggested were "all too often simply a means to control content."  558 U.S. at 340.

For many of the reasons already discussed, the classifications set by Colorado's press exemption easily pass this test.  Despite the advent of new media and distribution methods, there were and are real differences between an organization that provides periodic reports of happenings on the campaign trail and one that produces and distributes "feature-length negative advertisements that urge viewers to vote against" a particular political candidate.  *Citizens United,* 558 U.S. at 325.

Moreover, as recently as *McConnell,* the Supreme Court recognized that "[a] valid distinction exists between corporations that are part of the media industry and other corporations that are not involved in the regular business of imparting news to the public."  540 U.S. at 208 (internal quotation and alteration omitted). Thus, the Court held that FECA's "narrow [press] exception is wholly consistent with First Amendment principles").   *Id.* at 209.  This is consistent not only with the Court's earlier analysis in *MCFL,* but also with "[n]umerous federal statutes" that have distinguished between the institutional press and entities like Citizens United.  *McConnell,* 540 U.S. at 208, *citing* 15 U.S.C. §§1801-1804 (providing limited antitrust exemption for newspapers); 47 U.S.C. §315(a) (excepting newscasts, news interviews, and news documentaries from the requirement that broadcasters provide equal time to candidate for public office); *see also Federal*

*Election Comm'n v. Massachusetts Citizens for Life,* 479 U.S. 238, 244 (1986)

(reviewing factors that distinguished one-off newsletter from institutional press).

### VI.   Because a preliminary injunction would run against the public interest, the balance of harms favors the State.

Plaintiff asserts that enjoining Colorado's disclosure requirements would be

in the public interest, and that the balance of equities likewise tips in its favor.[10]

These elements are best considered together because the public interest in this case

is expressed in Amendment 27 itself: "…the interests of the public are best served

by…providing for full and timely disclosure of campaign contributions, independent

expenditures, and funding of electioneering communications[.]"  Colo. Const. art.

XXVIII, § 1.

Plaintiff asserts that the Tenth Circuit has held that a "First Amendment

injury… 'outweighs any prospective injury' to the government caused by enjoining

the enforcement of an invalid statute."  Doc. 4 at 25, *quoting Utah Licensed*

*Beverage Assn. v. Leavitt,* 256 F.3d 1061, 1076 (10th Cir. 2001).  Here, however, the

injury caused by enjoining the disclosure scheme would not be to the "government,"

it would be to the entire electorate of Colorado, prospective voters who would

deprived of their ability to "make informed choices in the political marketplace."

*McConnell,* 540 U.S. at 197.  Colorado's voters recognized this when they approved

Amendment 27 by a 2-1 margin in 1992.  The voter information guide for that

---

[10] Plaintiff also alleges that it will suffer irreparable harm absent an injunction. The Secretary agrees that the irreparable harm element would be satisfied if, and only if, Plaintiff is able to show that the challenged disclosure laws actually violate its constitutional rights.

election pointed out that one goal of the amendment was providing "more information about who is spending money to influence elections." Exhibit A (Blue Book) at 6. The Blue Book, which "provides important insight into the electorate's understanding of the amendment when it was passed and also shows the public's intentions in adopting the amendment," *Grossman v. Dean,* 80 P.3d 952, 962 (Colo. App. 2003), advised voters that before 2002, "some types of political advertisements [were] not regulated and therefore [could] be paid for anonymously. The proposal gives people information about who is paying for these advertisements right before an election." Exhibit A (Blue Book) at 6. Amendment 27 was explicitly designed to ensure that disclosure accompanies the type of communications that *Rocky Mountain Heist* represents; enjoining Colorado's disclosure provisions immediately before an election would therefore run substantially counter to the public interest.

Make no mistake, Plaintiff's facial challenge is a frontal attack on *all* campaign finance disclosure – at least for spending by individuals and entities unaffiliated with candidates. If a "feature-length negative advertisement" qualifies for the press exemption, then so too would a qualitatively identical 30-second advertisement. To accept Plaintiff's broad view of the press exemption would allow the exception to swallow the rule and, in doing so, would harm not only Colorado's electorate but also the institution of the press itself. Indeed, the institutional press examines and relies on disclosures made by groups like Citizens United as part of the fact gathering process for its journalistic endeavors. *See* Exhibit A (Blue Book) at 7 (arguments against adoption of Amendment 27 note that "Press reports and

opposition campaigns already make the sources of candidates' funding public"). It would run substantially counter to the public interest to hastily erase the lines drawn by the press exemption – lines that on the federal level have been recognized and upheld for more than 40 years – and in so doing deprive Colorado's voters of the "transparency [that] enables the electorate to make informed decisions and give proper weight to different speakers and messages." *Citizens United*, 558 U.S. at 370. Yet that is precisely the relief that the Plaintiff demands.

## CONCLUSION

For these reasons, Defendant respectfully requests that the Court deny Plaintiff's motion for a preliminary injunction.

Respectfully submitted this 4th day of September, 2014.

JOHN W. SUTHERS
Attorney General

*s/ Matthew D. Grove*
LEEANN MORRILL*
First Assistant Attorney General
MATTHEW D. GROVE*
Assistant Solicitor General
KATHRYN STARNELLA*
Assistant Attorney General

Public Officials Unit
State Services Section
Attorneys for Defendants
1300 Broadway, 6th Floor
Denver, Colorado  80203
Telephone:  (720) 508-6157
FAX:  (720) 508-6041
E-Mail: matt.grove@state.co.us
        leeann.morrill@state.co.us
        kathryn.starnella@state.co.us
*Counsel of Record

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 4, 2014, I served a true and complete copy of the within **BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** upon all parties through ECF-file and serve or as indicated below:

Theodore B. Olson
Matthew D. McGill
Amir C. Tayrani
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Ave., NW
Washington, D.C. 20036

Michael Boos
Citizens United
1006 Pennsylvania Ave., SE
Washington, D.C. 20003

*/s Matthew D. Grove*
Matthew D. Grove
